AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❏ Original        ❏ D



CLERK'S OFFICE
A TRUE COPY
Aug 23, 2024
s/JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | Case No. **24-M-477 (SCD)** |
| *or identify the person by name and address)* ) | |
| 5670 North 91st Street, Milwaukee, Wisconsin, ) | Matter No.: 2023R00109 |
| lower-level, northeast corner unit – to include its ) | |
| occupants (TARGET LOCATION) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

         An application by a federal law enforcement officer or an attorney for the government requests the search and seizure
of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A


         I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B


                                                                      9-6-24
         **YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
   ☑ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

         Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

         The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____Honorable Stephen C. Dries_____ .
                                                                      *(United States Magistrate Judge)*

         ❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
         ❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .


Date and time issued:    8-23-24 9:25 am                    *Stephen C. Dries*
                                                            _____
                                                                      *Judge's signature*

City and state:    Milwaukee, Wisconsin              Hon. Stephen C. Dries, U.S. Magistrate Judge
                                                            *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

## PLACE TO BE SEARCHED

**5670 North 91st Street, Milwaukee, Wisconsin, lower-level, northeast corner unit (TARGET LOCATION)** – to include its occupants. This address is used by WILLIAMS and his drug trafficking organization. Described as a multi-unit apartment building, the **TARGET LOCATION** is located in the lower level, northeast corner unit. The building has a tan brick exterior and a red in color front door with two red in color doors on the rear. The numbers 5670 are affixed to the building directly above the center of the front door. When looking at the rear of the residence the **TARGET LOCATION** is the lower level right side red door.





34

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, between February 2023 to present including:

a.  Evidence of the crimes described above;

b.  Preparatory steps taken in furtherance of those crimes;

c.  Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

d.  Evidence of motive, intent, or knowledge of the crime described above;

e.  Evidence of the location, whereabouts, and patterns of travel of Duane WILLIAMS;

f.  Evidence about the appearance, clothing, and identity of Duane WILLIAMS;

g.  Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances and counting drug proceeds;

h.  Containers to hold or transport controlled substances and drug trafficking related items and proceeds;

i.  Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

j.  Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

k.  Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

l.  Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

35

m. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

n. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

o. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxicab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

p. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

q. Photographs, videotapes or other depictions of assets, coconspirators, controlled substances, or other paraphernalia associated with drug trafficking;

r. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

s. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

t. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachments A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of any individuals found at the **TARGET LOCATION** to the fingerprint sensor ("Touch ID") and (2) to present the face of any individuals found at the **TARGET LOCATION** to the facial recognition sensor, such

as a camera, ("Face ID") of the device found at the **TARGET LOCATION** for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note:  The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers.  If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.  If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.



CLERK'S OFFICE
A TRUE COPY
Aug 23, 2024
s/ JDH
Deputy Clerk U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>5670 North 91st Street, Milwaukee, Wisconsin,<br>lower-level, northeast corner unit – to include its<br>occupants (TARGET LOCATION) | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **24-M-477 (SCD)**

Matter No.: 2023R00109

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), 843 & 846 | Possession with intent to distribute and distribute a controlled substance; Use of a communication device in furtherance of drug trafficking; and Conspiracy to possess with intent to distribute and distribute a controlled substance; |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TYLER OWENBY Digitally signed by TYLER OWENBY
Date: 2024.08.22 10:53:09 -05'00'

_____
*Applicant's signature*

SA Tyler F. Owenby, DEA

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date: _____ 8-23-24 _____

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
## Matter No.: 2023R00109

I, Tyler F. Owenby, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA").  I have been so employed since July 2021 and am currently assigned to the DEA Milwaukee District Office.  As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963.  I have been involved in electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

2.      Prior to my employment with the DEA, I spent the previous five years working as an Analyst assigned to the Columbia Missouri Police Department's Vice Narcotics and Organized Crime Unit.  As part of my duties as an Analyst, I was formally trained and certified in the areas of mobile phone forensics, cell tower and phone toll analysis, and advanced open source intelligence gathering techniques.

3.      I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.  More specifically, my training and experience includes the following:

a.    I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.    I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c.    I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d.    I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations. I am familiar with the language utilized over the telephone or other communication applications to discuss drug trafficking, and know that the language is often limited, guarded, and coded. Additionally, I know that drug traffickers often change their phone numbers and cellular devices on frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identity.

e.    I know that drug traffickers commonly have in their possession, and at their residences and other locations ("stash houses") where they exercise dominion and control, controlled substances, firearms, ammunition, drug proceeds, and records or receipts pertaining their drug trafficking;

f.    I know that drug traffickers used what is refer to as a "stash house" to stow illegal items such as illegal controlled substance, packaging paraphernalia, illegal firearms, ledgers, and US currency. Often times members of drug trafficking organizations have to make stops at the stash locations to pick up illegal controlled substance to deliver. Additionally, drug traffickers will have customers meet drug traffickers near the stash location. Multiple stops can be made in a day at these locations. This is done so the trafficker does not have to carry additional illegal controlled substances in their vehicle or person or maintain them at their residence. This protects the trafficker from law enforcement investigations as they do not have illegal controlled substances on them after the delivery is made or inside their personal residence. Often time the US currency will be transported after the delivery to the stash house to protect against law enforcement investigation and rival drug trafficker's robbery crews.

2

g. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5. The facts in this affidavit come my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; (c) court-authorized electronic communications; and (d) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

6.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribute a controlled substance); 843  (use of a communication device in furtherance of drug trafficking); and 846 (conspiracy to possess with intent to distribute and distribute a controlled substance) have been committed, are being committed, and will be committed by Duane WILLIAMS   (DOB:XX/XX/1998),  Anton  MATTHEWS  (DOB:XX/XX/1996)  Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990) and others known and unknown to case agents.   There is also probable cause to search the location described in Attachment A for evidence of these crimes, as described in Attachment B.

## PLACE TO BE SEARCHED

8.     This affidavit is submitted in support of applications for search warrants to seek evidence of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribute a controlled substance); 843   (use of a communication device in furtherance of drug trafficking); and 841 (conspiracy to possess with intent to distribute and distribute a controlled substance) for the following location ( **"TARGET LOCATION"**) associated with Duane WILLIAMS and other members of the drug trafficking organization (DTO), who have committed, are committing, and will continue to commit the above-listed offenses:

   a. **5670 North 91st Street, Milwaukee, Wisconsin, lower-level, northeast corner unit (TARGET LOCATION)** – to include its occupants.  This address is used by WILLIAMS.   Described as a multi-unit apartment building, the **TARGET LOCATION** is located in the lower level, northeast corner unit.  The building has a tan brick exterior and a red in color front door with two red in color doors on the

4

rear. The numbers 5670 are affixed to the building directly above the center of the front door. When looking at the rear of the residence the **TARGET LOCATION** is the lower level right side red door.

## PROBABLE CAUSE

9.      Since February 2023, the Drug Enforcement Administration (DEA), the United States Postal Inspection Service (USPIS), and the Wisconsin Department of Justice have been conducting an investigation involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITCH (XX/XX/1990) and other known and unknown individuals, who are believed to be members of a Milwaukee-area based DTO engaged in the distribution of cocaine/fentanyl and believed to be sourced from California.

### A.      Background

10.      On February 23, 2023, United States Postal Inspection Service Inspector Kim Lincoln was alerted to a parcel bearing USPS Priority Mail Express tracking number EI 649 372 511 US (wooden crate) being shipped to Jordan Woodman at the address 1940 North 15th Street, Milwaukee, WI, 53205. The parcel was shipped from California with a return name and address of the "Earthquake Store" located in Burbank California. The address of 1940 North 15th Street does not exist, and the parcel was not delivered. On this same date two individuals showed up at the Hilltop Post Office in Milwaukee, Wisconsin attempting to take custody of the package addressed to Jordan Woodman. The first individual claimed to be James Woodman and further stated to the employee at the post office that he was the nephew of Jordan Woodman. The second individual stated they were Jordan Woodman. However, the post office would not relinquish custody of the package because the address on the ID provided by Jordan Woodman was 1942

5

North 15th Street which did not match the address the parcel was addressed to. Inspector Lincoln ultimately discovered that the parcel contained just over two kilograms of fentanyl.

11.    Case agents then examined USPS databases and discovered that this parcel and others were being tracked by IP addresses in both California and Mexico. Case agents identified other packages identical to the initial parcel (EI 649 372 511) containing fentanyl all addressed to Jordan Woodman, two in Milwaukee, one in the Saint Louis, Missouri area, and one in northern Illinois. On February 27, 2023, case agents were conducting follow-up regarding the parcel (EI 649 372 511) at the Hilltop Post Office when an individual came to the counter attempting to claim the package. This person identified himself to Postal Inspectors as Jordan Woodman. This subject presented an ID Card Receipt from the Wisconsin Department of Transportation issued to Jordan Woodman at 1942 N 15th Street, Milwaukee, WI, 53205. Once the subject realized that they were speaking with law enforcement officers and not Post-Office employees, he and a second subject with him immediately left the post office. Case agents later determined that the identification Woodman presented was false and positively identified him as Patrick VAUGHN. Case agents also identified the subject claiming to be "James" (nephew of Jordan Woodman) as James E. JAMES III. Both JAMES and VAUGHN are Milwaukee residents.

12.    On June 14, 2023, SA Mitchell Ward along with USPIS Inspector Kim Lincoln interviewed Patrick VAUGHN regarding this investigation. VAUGHN admitted to attempting to retrieve the parcel (EI 649 372 511 US) from the Hilltop Post Office for his drug supplier nicknamed "400" on February 23, 2023. VAUGHN said he buys small amounts of cocaine and "weed" (i.e., marijuana) from "400". VAUGHN stated he did not know "400's" real name, but provided his phone number, i.e., 414-627-2727, which VAUGHN used to contact "400" to arrange the purchase of cocaine. VAUGHN stated that "400" uses various cars to deliver cocaine.

6

VAUGHN described "400" as a black male, aged between mid-thirties and early-forties, who had a short or bald hairstyle.

13.     Case agents then obtained a court order authorizing them to obtain call information related to telephone 414-627-2727 and reviewed historical call detail records of telephone 414-627-2727. Case agents recognized VAUGHN's number as one of the top callers to telephone 414-627-2727.  From April 14, 2023 to June 14, 2023 VAUGHN was using telephone number 414-998-7482 and communicated 127 times with telephone 414-627-2727.  Case agents know that VAUGHN's phone number is 414-998-7482 because VAUGHN provided case agents consent to review the contents of his phone when he was interviewed on June 14, 2023.

14.     Additionally, case agents identified another top caller as Bradley DIDENKO of 3142 South Pine Street (lower), Milwaukee, Wisconsin.  DIDENKO was using telephone number 414-881-9687 from the time period of April 19, 2023 to June 16, 2023 and call records reflect 365 call between DIDENKO and telephone 414-627-2727.  A search of law enforcement data bases showed that Jordan MAYRAND also resides at 3142 South Pine Street (lower), Milwaukee, Wisconsin 53207.  On June 9, 2023, the West Allis Police Department arrested MAYRAND for several felony drug offences (Eastern District of Wisconsin case no.: 23-cr-219).

15.     On August, 1, 2023, a State of Wisconsin search warrant was executed at DIDENKO's residence, 3142 S. Pine Ave, Milwaukee, WI.  Due to the nature of the search warrant and contact with Law Enforcement DIDENKO's probation and parole officer put a probation hold on DIDENKO and DIDENKO was taken into custody.

16.     On August 1, 2023, case agents interviewed Bradley DIDENKO.  DIDENKO stated that he regularly purchases small amounts of fentanyl from an unknown black male. DIDENKO stated that he calls telephone 414-627-2727 to arrange the purchase of fentanyl.

7

DIDENKO stated the same person does not always deliver the fentanyl to him after he places an order. DIDENKO stated that the "main guy" is a black male who he knows only by the nickname of "Fast." DIDENKO stated that although he recently hasn't seen "Fast," "Fast's workers" last sold him a gram of fentanyl on July 31, 2023. DIDENKO said he typically buys between a half gram and a gram of fentanyl every other day. Case agents know that DIDENKO was using telephone number 414-881-9687 to contact telephone 414-627-2727 because he provided consent for case agents to review the contents of his cellular phone when he was interviewed on August 1, 2023.

17.     On August 16, 2023, case agents spoke with a confidential source (CS-1) regarding this investigation. CS-1 stated that an individual known as "Fast" sells fentanyl and cocaine in the greater Milwaukee area. CS-1 stated that "Fast" has been using telephone 414-627-2727 to conduct sales of fentanyl and cocaine for the past year. CS-1 stated that once the order is placed on telephone 414-627-2727, either "Fast" or one of his "crew" delivers the narcotics at various locations in the greater Milwaukee area. CS-1 stated that most narcotics transactions with "Fast" occur in public areas chosen by "Fast."

18.     CS-1's information is credible and reliable because CS-1 has given information concerning individuals involved in illegal activities. CS-1's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance. CS-1 has made statements against his/her penal interest. CS-1 has felony convictions for Manufacture/Delivery Cocaine and Forgery. CS-1 has no arrests or convictions relating to dishonesty. CS-1 is cooperating with law enforcement for monetary compensation. Case agents are aware that CS-1 cooperated with another law enforcement agents in April 2023 and during a controlled buy CS-1 attempted to keep some of the controlled

8

substances. Law enforcement confronted CS-1 and CS-1 admitted to conduct. In relation to the controlled buys outlined below, case agents have conducted surveillance and reviewed the recorded drug buys. Case agent have not observed any incidents of dishonesty or concerns about CS-1 keeping any of the controlled substances during this investigation.

19. On September 20, 2023, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, authorized a warrant for electronic surveillance of telephone number 414-627-2727.

**B.    Controlled Buys**

20. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CS-1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

9

21.     Under the direction of case agents CS-1 made a total of six controlled buys by communicating with the holder of telephone 414-627-2727.

### a. October 5, 2023 Controlled Buy - Anton MATTHEWS

22.     On October 5, 2023, CS-1 arranged to purchase 1 gram of crack cocaine and 1/2 gram of fentanyl for $130 USC by calling 414-627-2727.  Telephone 414-627-2727  was answered by an unknown male who directed CS-1 to come to 4936 North 40th Street, Milwaukee, Wisconsin to complete the transaction.  CS-1 explained to case agents that 4936 North 40th Street was a location often used by this DTO, and stated they had been directed to this address on several occasions.  CS-1 stated that this was a residential address with a long wheelchair ramp coming from the front door and extending towards the street.  Approximately five minutes after CS-1 confirmed the location, CS-1 received another call from telephone 414-627-2727 and CS-1 was then instructed to meet in the area of 7th Street and Capitol in Milwaukee.  CS-1 stated they'd been to this area in the past to conduct transactions and believed there was a house in this area where they would be directed. CS-1 did not recall an exact address.

23.     Surveillance had already been established in the area of 7th Street and observed a silver Jeep Cherokee, bearing Wisconsin plates ALY-1398 (Jeep) arriving in front of 4076 North 7th Street.  According to the Wisconsin Department of Transportation, ALY-1398 is registered to Anton MATTHEWS at 4076 North 7th Street, and case agents positively identified MATTHEWS as the driver of the Jeep based on MATTHEWS driver's license photograph.  MATTHEWS was observed exiting the Jeep and walking to the front porch area of 4076 North 7th Street.  A short time later, MATTHEWS was observed walking back toward the Jeep and entering the driver's seat.  MATTHEWS was then observed pulling away from the front 4076 North 7th Street and immediately pulling over around the corner on Fiebrantz Avenue, just East of 7th Street.

10

24.     CS-1 received another phone call from telephone 414-627-2727 shortly after the Jeep pulled around the corner.  CS-1 was instructed to meet near the alley that runs behind the 7th Street address.  CS-1 was then observed by case agents arriving in the area and pulling directly behind the Jeep on Fiebrantz Avenue.  CS-1 was observed by case agents exiting the CS vehicle and entering the front passenger seat of the Jeep.  CS-1 was inside the Jeep for approximately two minutes.  While inside the Jeep, CS-1 obtained suspected controlled substances in exchange for $130.  CS-1 then exited the Jeep and returned to Cs-1's vehicle.  CS-1 was followed directly back to the predetermined meet location by case agents where CS-1 turned over two small baggies, one containing suspected crack cocaine and one containing suspected fentanyl.  The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.  CS-1 was later shown a driver's license photograph of Anton MATTHEWS, who CS-1 positively identified as the individual who sold CS-1 the suspected crack cocaine and suspected fentanyl inside the Jeep.  CS-1 stated that MATTHEWS was not the individual CS-1 knew as "Fast."

**b.  October 12, 2023 Controlled Buy - Lorenzo GOODEN**

25.     On October 12, 2023, under the direction of case agents, CS-1 conducted a controlled purchase of fentanyl and crack cocaine with the DTO.  CS-1 called telephone number 414-627-2727 and it was answered by an unknown male.  CS-1 was instructed to come to the area of 1st Street and National in Milwaukee, Wisconsin.  CS-1 was followed by case agents to the area of 1st Street and National where surveillance had already been established.  CS-1 parked on the south side of East Florida Street to the east of 1st Street, Milwaukee, Wisconsin.  Approximately two minutes later, case agents observed a black Nissan SUV, bearing Wisconsin plates AKF-5062 (Nissan) arrive in the area and park on the opposite side of Florida Street from CS-1's vehicle.

11

26.     CS-1 exited his/her vehicle and entering the front passenger seat of the Nissan.  The Nissan then pulled away east on Florida Street and pulled over in the area of Florida Street and Water Street.  The Nissan stopped for a very brief period of time at Florida Street and Water Street and then drove back to where CS-1's vehicle was parked.  CS-1 exhibited the Nissan and got back into CS-1's vehicle.  While inside the Nissan, CS-1 obtained suspected controlled substances in exchange for $130.  The Nissan was under constant visual surveillance by case agents for the duration of the interaction with CS-1.  CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.  Once back at the predetermined location CS-1 handed over two small baggies, one containing suspected crack cocaine and the other containing suspected fentanyl.  The suspected crack cocaine and suspected fentanyl weighed approximately 1 gram each and were later subjected to field tests where they both yielded positive results.

27.     CS-1 was later shown a photograph of GOODEN, who CS-1 positively identified as the individual in the black Nissan who had sold CS-1 the suspected crack cocaine and suspected fentanyl.  CS-1 stated that GOODEN was not the individual CS-1 knew as "Fast."  Case agents also compared the video recording from the buy and booking photographs of GOODEN and positively identified GOODEN as the individual that sold CS-1 fentanyl and crack cocaine.

### c.  October 26, 2023 Controlled Buy - Duane WILLIAMS

28.     On October 26, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of 1/2 gram of fentanyl and 1 gram of crack cocaine for $130 USC.  CS-1 called telephone 414-627-2727, which was again answered by an unknown male.  CS-1 was instructed to come to the area of 7th Street and Walnut in Milwaukee, Wisconsin.  CS-1 was then directly followed by case agents to the area of North 7th and Walnut where surveillance had

12

already been established.  CS-1 ultimately parked the CS-1's vehicle on West Reservoir Avenue just to the west of North 7th Street.  Approximately twenty minutes after CS-1 parked on West Reservoir Avenue, case agents observed a silver Honda Accord car bearing Wisconsin plates ANY-6044 (Accord) arrive in the area and park near the CS vehicle.  CS-1 was then observed exiting the CS-1's vehicle and walking to the Accord.  CS-1 was observed leaning into the passenger window of the Accord for approximately three minutes.  While leaning into the Accord, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then walked back to CS-1's vehicle and departing the area.  CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.  Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents.  The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

29.     Utilizing a law enforcement database case agent were able obtain and compare booking photographs and determined that Duane WILLIAMS (DOB: XX/XX1998) was the driver of the Accord.  CS-1 was later shown a photograph of WILLIAMS to which CS-1 positively identified as the individual who had sold CS-1 the suspected crack cocaine and suspected fentanyl. CS-1 further stated that they believe WILLIAMS lives at 4936 North 40th Street, Milwaukee, Wisconsin, due to previous interactions with WILLIAMS at this address.  CS-1 stated that during the deal with WILLIAMS, CS-1 observed a Glock with an extended magazine tucked in between the driver's seat and the center console of WILLIAMS vehicle in plain view.

30.     Case agent also reviewed WILLIAMS criminal history.   WILLIAMS was convicted of a felon offense of attempting to flee in Milwaukee County Case Number 2019CF1598.

31.     During surveillance at 4936 North 40th Street, Milwaukee, Wisconsin, I also observed the Accord parked in the driveway at on multiple occasions.  Additionally, case agents observed DIDENKO meet with the Accord on July 31, 2023 in the alley behind DIDENKO's residence, 3142 South Pine Street (lower), Milwaukee, Wisconsin.  On this occasion, case agents observed what appeared to be a hand-to-hand drug transaction between DIDENKO and the driver of the Accord.

### d.  November 13, 2023 Controlled Buy - Duane WILLIAMS

32.     On November 13, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC.  Case agents met CS-1 at a predetermined location and CS-1 called telephone number 414-627-2727, and the call went unanswered.  A few moments later CS-1 received an incoming call from telephone number 414-627-2727 and the individual calling instructed CS-1 to go to the area of North 41st Street and West Hampton Avenue.  CS-1 believed the person utilizing telephone number 414-627-2727 was the same individual (Duane WILLIAMS) that CS-1 had met with on October 26, 2023 based on the sound of the voice.

33.     CS-1 was followed by case agents to the 4500 block of North Sherman Boulevard.  At this point, CS-1 received an incoming call from telephone number 414-627-2727 and was directed to go to the area of North 14th Street and West Capitol Drive.  Prior to CS-1 arriving, case agents established surveillance in the 3900 block of North 14th Street in anticipation of the deal.  Once arriving in the area case agents observed Duane WILLIAMS occupying the driver's seat of the Accord which was parked in front of 3943 North 14th Street.  Case agents also observed an unknown female passenger in the Accord.

14

34.     Once CS-1 arrived in the area CS-1 was observed parking on the west side of the street, directly in front of the Accord.  CS-1 was then observed exiting CS-1's vehicle and walking to the passenger side of the Accord where CS-1 engaged with the occupants of the Accord through the open passenger window.  CS-1 completed the controlled purchase and was observed walking back to CS-1's vehicle and departing the area.  CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

35.     Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents.  The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

36.     CS-1 stated that they had observed two Ziplock bags in WILLIAMS' lap, one containing what appeared to CS-1 as "at least five ounces of purple fentanyl" and the other contained what appeared to contain "three ounces of cocaine."  CS-1 stated that WILLIAMS retrieved small amounts of both substances and weighed them on a small digital scale located on the arm rest of the Accord.  CS-1's statements were corroborated by the Audio and Video recording device that CS-1 was equipped with during this transaction.

**e.     November 30, 2023 Controlled Buy - Duane WILLIAMS**

37.     On November 30, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC.  Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and the call went unanswered.  A few moments later, CS-1 received an incoming call from the telephone 414-627-2727.  CS-1 answered the call and was ultimately instructed to come to the area of North 40th Street and West Hampton Avenue.  Case agents were already aware that Duane WILLIAMS lived at

15

4936 North 40th Street and surveillance units were sent to that location after the phone call between CS-1 and telephone 414-627-2727. Once surveillance units were established, a black Maserati sedan (Maserati) was observed back into the driveway of 4936 North 40th Street and case agents observed a black male occupying the driver's seat. CS-1 was followed by case agents from predetermined location to the area of the 4900 block of North 40th Street and park CS-1's vehicle on the East side of the road. CS-1 was observed walking to the Maserati and engaging with the driver of the vehicle through the open driver's window. CS-1 conducted the drug transaction and was then observed walking back to the CS vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

38.     Following the controlled purchase case agents again met with CS-1 at a predetermined location. Once at the predetermined location CS-1 handed over approximately one half gram of suspected fentanyl and one half gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 stated they had observed two plastic Ziploc bags in WILLIAMS lap, one containing what appeared to CS-1 to be "a large amount of purple fentanyl" and the other contained what appeared to contain "an ounce of cocaine." CS-1 stated that WILLIAMS had retrieved small amounts from each bag and weighted them on a small digital scale located on the arm rest of the Maserati and then handed CS-1 loose amounts of each product, without a container. CS-1 also observed a large stack of US Currency located near the gear shifter of the Maserati that CS-1 estimate to be six inches thick.

**f.      January 23, 2024 Controlled Buy – Rico SMITH**

16

39.     On January 23, 2024, under the direction of case agents, CS-1 conducted another controlled purchase of crack cocaine in exchange $130 USC.  Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and CS-1 was directed by a male voice to come to the area of 3rd Street and West Scott in Milwaukee, Wisconsin.  CS-1 was followed from the predetermined location to the area of 3rd and Scott where surveillance had already been established.  CS-1 was observed parking near the intersection of South 3rd Street and West Scott.  Just a few moments later case agents observed a black Acura SUV, Wisconsin plate AMZ-2064 (Acura) arrive and park on the opposite side of the street as CS-1's vehicle.  CS-1 was observed exiting CS-1's vehicle and walking to the Acura and engaging with the driver of the Acura through the open driver's window.  CS-1 and the driver conducted the drug transaction at this point.  CS-1 ultimately walked back to CS-1's vehicle and departed the area.  Surveillance was terminated shortly after this transaction and the Acura was not followed away from the area.

40.     Following the controlled purchase case agents again met with CS-1 at a predetermined location.  Once at the predetermined location CS-1 handed over a small plastic baggie containing suspected crack cocaine.  The suspected crack cocaine was later subjected to field tests where it yielded positive results.  The suspected cocaine was approximately 2.2 grams.

41.     CS-1 later stated to case agents that the individual driving the black Acura was the individual CS-1 knew as "Fast."  Case agents later positively identified "Fast" as Rico L. SMITH by comparting surveillance photographs to SMITH's Wisconsin Driver's license photograph.  CS-1 was also shown a Wisconsin Driver's License photograph of SMITH with no name or identifies visible and CS-1 positively identified the photograph as the individual CS-1 knew to be "Fast."  Additionally, the Acura, driven by SMITH, is registered to Kimberly NEAL, with an address of 623 West Clarke Street, Milwaukee, Wisconsin.  Based on my training and experience, I know

17

that it's common for drug traffickers to use vehicles not registered to themselves to avoid identification. Through previous law enforcement contacts and reports reviewed, case agents believe that NEAL is SMITH's girlfriend.

**g.  May 9, 2024 Controlled Buy - Duane WILLIAMS**

42.  In May 2024, case agents developed a confidential source (CS-2) who stated they could purchase fentanyl from a subject CS-2 knew as "BJ." CS-2 provided telephone number (262) 412-5521 as the number that CS-2 uses to contact "BJ." Case agents were already aware through law enforcement database checks that the owner or holder of telephone number (262) 412-5521 was Duane WILLIAMS, who resides at 4936 North 40th Street, Milwaukee, Wisconsin. Case agents provided a photograph of WILLIAMS to CS-2, who identified the person in the photograph as "BJ." CS-2 stated that "BJ" lived near 40th and Hampton in Milwaukee and further said that "BJ" lived in a house that had a long wheelchair ramp. Case agents are aware that WILLIAMS's residence is approximately two blocks north of Hampton Avenue, directly on North 40th Street, and has a long wheelchair ramp that extends from the front door down to the sidewalk. CS-2 stated that "BJ" typically charges $80 per gram of fentanyl.

43.  CS-2's information is credible and reliable because CS-2 has given information concerning individuals involved in illegal activities. CS-2's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance. CS-2 has made statements against his/her penal interests. CS-2 has one felony conviction for flee/elude traffic officer. CS-2 has no arrests or convictions relating to dishonesty. CS-2 is cooperating with law enforcement for judicial consideration.

44.  On May 9, 2024, under the direction of case agents, CS-2 arranged to purchase $600 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using

18

telephone number (262) 412-5521. During the call, WILLIAMS told CS-2 that he was on 40th Street. Case agents and CS-2 already knew that WILLIAMS resided at 4936 North 40th Street, Milwaukee, Wisconsin. At this time, case agents dispatched surveillance units to the area of 4936 North 40th Street. Case agents then followed CS-2 from the predetermined meeting location to the vicinity of 4936 North 40th Street, Milwaukee, Wisconsin. Once CS-2 arrived in that area, CS-2 placed another call to telephone number (262) 412-5521 and was instructed by WILLIAMS to go inside the residence and retrieve the fentanyl from a green boot. WILLIAMS further instructed CS-2 to leave the money inside the boot. Case agents observed CS-2 exit the CS-2 vehicle and enter the front door of 4936 North 40th Street, Milwaukee, Wisconsin where CS-2 was out of the case agents' view for a few moments. Case agents later learned from CS-2 that once inside CS-2 retrieved fentanyl from a boot and left $600, before exiting the front door. Case agents observed CS-2 return to the CS-2 vehicle and depart the area. Case agents directly followed CS-2 from WILLIAMS's residence to a predetermined meeting location.

45. Once at the meeting location, case agents recovered from CS-2 a plastic sandwich bag that contained a greyish/purple substance suspected to be fentanyl. The suspected fentanyl had a weight of 6.4 grams and was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents later reviewed the audio/video captured by CS-2 during the controlled buy and found it to corroborate CS-2's version of events.

**h.      June 3, 2024 – Controlled Buy - Duane WILLIAMS**

46. On June 3, 2024, under the direction of case agents, CS-2 arranged to purchase $400 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using the telephone number (262) 412-5521. During the call, WILLIAMS directed CS-2 to come to the area of 86th and Silver Spring in Milwaukee, Wisconsin.

19

47.     Case agents followed CS-2 from the predetermined location to the area of N 91st Street and Silver Spring at which time case agents monitoring CS-2's active audio/video devices overheard CS-2 receive a call from WILLIAMS, who directed CS-2 to come to the alley between North 90th and North 91st Street to the north of West Thurston Avenue. Case agents maintained visual contact with CS-2 as CS-2 turned north on North 91st Street, east on West Thurston Avenue, and then made an immediate left turn into the alley between North 90th and North 91st Street. As CS-2 pulled into the alley, case agents observed a gray SUV parked in the middle of the alley. Case agents observed a heavyset black male standing next to the passenger side of the SUV engaging with the driver through the open passenger window. Case agents observed CS-2 pulling up to the SUV's driver's side window and engage with the driver of the gray SUV through both vehicles' open driver's side windows. As CS-2 pulled up to the window of the SUV the unknown black male that was standing next to the passenger side was observed walking away from the SUV and entering the apartment building **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION),** using the lower-level northeast corner door of the building (Figure 1).



(Figure 1)

20

48. Your affiant observed CS-2 hand a white plastic bag to the SUV's driver and then moments later observed the SUV's driver throw a white plastic bag into CS-2's vehicle through its open driver's side window. Case agents then observed CS-2 depart the area of the buy and drive to a nearby parking lot as directed by case agents. Case agents directly followed CS-2 from the area of the buy to the meeting location. At no time was CS-2 out of the case agents' sight.

49. Once at the meeting location, CS-2 provided case agents with a white plastic grocery bag that contained a white rock-like substance suspected to be fentanyl. CS-2 stated that some of the suspected fentanyl had fallen out of the bag when thrown into CS-2's vehicle during the controlled buy. Case agents thoroughly search CS-2 and the CS-2 vehicle and recovered several small pieces of suspected fentanyl from the passenger seat and floorboard area of the CS-2 vehicle. CS-2 positively identified the driver of the gray SUV as "BJ" (WILLIAMS). CS-2 said "BJ" provided CS-2 the suspected fentanyl in exchange for $400 in OAF. The suspected fentanyl was left in the plastic grocery bag and had a total gross weight of 13.1 grams. The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl.

50. As the gray SUV exited the area of the controlled purchase, case agents were able to identify the vehicle as a Maserati SUV bearing Wisconsin plate AVP-9573 (SUV). According to the Wisconsin Department of Transportation, this plate lists to a 2018 gray Maserati Levante and is registered to Dantavia Vernard Rule with an address of 161 West Wisconsin Avenue, #225, Milwaukee, Wisconsin. The SUV was not surveilled as it departed the area due to its erratic driving behavior.

51. In preparation for this controlled purchase, case agents had also dispatched surveillance units to the area of WILLIAMS's residence, located at 4936 North 40th Street,

21

Milwaukee, Wisconsin. Approximately 10 minutes after WILLIAMS left the alley where the controlled purchase took place, surveillance units observed the SUV arrive and park in the driveway of WILLIAMS's residence. Surveillance units were able to determine the plate on the vehicle to be AVP-9573 and also observed a black male exit the SUV and enter 4936 North 40th Street. Minutes after the black male entered the residence, the same black male exited the front door at which time DEA Special Agent Julia Gray obtained photographs of this black male. I later viewed these photographs and positively identified the black male depicted in the photographs as Duane WILLIAMS.

### i. August 15, 2024 – Controlled Buy - Duane WILLIAMS

52. On August 15, 2024, under the direction of case agents, CS-2 arranged to purchase $240 worth of fentanyl from WILLIAMS. CS-2 provided telephone number 414-308-2767 as a number CS-2 had recently received from WILLIAMS as WILLIAMS new telephone number. CS-2 made telephone contact with WILLIAMS who was utilizing telephone number 414-308-2767. During the call, WILLIAMS directed CS-2 to come to the area of 91st and Silver Spring in Milwaukee, Wisconsin.

53. Case agents followed CS-2 from the predetermined location to the area of North 91st and Silver Springs in Milwaukee, Wisconsin. CS-2 was observed turning north on North 91st from Silver Spring and then east on West Thurston Avenue. CS-2 then made an immediate north bound turn into the alley between North 91st and North 90th Street where the CS was observed parking in the alley. Just moments before CS-2 was observed entering the alley case agents observed a silver Honda Accord, Wisconsin Plate AXX-8065 (silver Honda) pull into the alley and park on the parking slab approximately three structures north of Thurston on the west side of the alley. Wisconsin plate AXX-8065 is registered to Jaia DOUGLAS with a registered address

22

of 4605 North 48th Street, Milwaukee, Wisconsin. DOUGLAS is the known girlfriend of Duane WILLIAMS.

54.     As CS-2 was observed parking case agents observed a subject that was later positively identified as WILLIAMS exit the silver Honda and engage with CS-2 through CS-2's open driver's side window. Case agents monitoring the audio/video device CS-2 was equipped with overheard WILLIAMS tell CS-2, "let me go get it together." WILLIAMS was then observed walking from CS-2's vehicle to **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)** and entering the **TARGET LOCATION** using the lower-level northeast corner door of the building (previously depicted in Figure 1). After several minutes case agents observed CS-2 exit CS-2's vehicle and walk to the same lower-level northeast corner door of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)** (previously depicted in Figure 1) where CS-2 could be observed interacting with someone in the threshold of the lower-level northeast corner door. CS-2 remained in the doorway for just a brief moment and was then observed walking back to CS-2's vehicle and departing the area. Case agents then directly followed CS-2 away from the location back to a predetermined location. At no time was CS-2 out of view of case agents.

55.     Once at the predetermined location CS-2 handed over a small baggie containing suspected fentanyl that was purple in color. CS-2 positively identified WILLIAMS as the subject that had provided the baggie of suspected fentanyl to CS-2 while CS-2 was in the lower-level northeast corner doorway of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)**. CS-2 stated that when CS-2 initially arrived in the alley they saw WILLIAMS walking from the silver Honda to CS-2's vehicle. CS-2 stated that they believed WILLIAMS had the fentanyl at this time and had handed WILLIAMS the buy money. CS-2 stated that after

23

WILLIAMS took the buy money that WILLIAMS said that he had to go get it (referring to the fentanyl). CS-2 stated that they saw WILLIAMS walk into the third apartment building to the north of West Thurston Avenue, and further stated that WILLIAMS entered the door on the ground floor farther to the right when looking at the rear of the structure, identified by case agents as lower-level northeast corner door of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)** (depicted in Figure 1). After several minutes CS-2 stated that they observed WILLIAMS in the lower-level northeast corner doorway of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)** waving for CS-2 to come to the doorway. CS-2 stated that at this time they left CS-2's vehicle and went to the lower-level northeast corner doorway of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)** where WILLIAMS was currently weighing out the fentanyl on a scale inside the apartment unit. CS-2 stated that they observed three other unidentified black males inside the northeast corner unit of the lower level apartment unit of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION).** CS-2 also observed additional fentanyl in plain view inside this apartment unit of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)**. CS-2 further stated that it appeared the apartment unit located in lower-level northeast corner of **5670 North 91st Street, Milwaukee, Wisconsin (TARGET LOCATION)** was a stash house of some kind used by WILLIAMS based on the number of unknown individuals inside and the fact that drugs and scales were in plain view from the doorway. Case agents do not believe WILLIAMS resides at the **TARGET LOCATION**. On the morning of August 16, 2024, I observed the silver Honda parked in the driveway of 4936 North 40th Street, Milwaukee, Wisconsin, consistent with WILLIAMS still residing at that location.

24

56.     The suspected fentanyl the CS-2 provided to case agents totaled 4.1 grams.  The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl.

## TECHNICAL BACKGROUND

57.     I know based upon my training and experience that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, and on persons engaged in drug trafficking within the residence.  I know through personal training and experience in investigating drug trafficking, controlled substances are frequently stored with drug proceeds, other drug paraphernalia and documentation of drug trafficking at drug traffickers' residences and stash houses; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target location including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence including vehicles, garages and basements and on their person.

58.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET LOCATION**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the

25

seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

59.    *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the **TARGET LOCATION**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

60.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

26

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET LOCATION** because:

      a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of

computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

28

f.  I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

61.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.
.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application

29

software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

62. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

63. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

64. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These

biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

65.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

66.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.  If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

67.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in

31

some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

68.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

69.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

70.     Due to the foregoing, with respect to any person who is located in the **TARGET LOCATION** during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant,  it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs)

of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

71.     Based on the foregoing, I believe there is probable cause to believe Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996) Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990) has committed violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribute a controlled substance); 843  (use of a communication device in furtherance of drug trafficking); and 846 (conspiracy to possess with intent to distribute and distribute a controlled substance).  I further believe that there is probable to believe that located at and in the **TARGET LOCATION** further described in attachment A, there is evidence of these crimes, all of which is detailed more specifically in Attachment B, that a warrant issued authorizing the search of the same. I further believe that there is probable cause to believe that located at and in the **TARGET LOCATION** described in Attachment A, there is evidence of the Target Offenses. Case agents believe there are currently documents and records showing dominion and control of the **TARGET LOCATION** and subject vehicle, cellular telephones, electronic devices, and other computers, and other evidence evincing the WILLIAMS's involvement in the drug trafficking offenses described above, located within the premise, vehicle, and person described in Attachments A. For all of the foregoing reasons, I request authorization to search the premise, vehicle, and person more fully described in Attachments A for the things described in Attachment B.

33

## ATTACHMENT A

## PLACE TO BE SEARCHED

**5670 North 91st Street, Milwaukee, Wisconsin, lower-level, northeast corner unit (TARGET LOCATION)** – to include its occupants. This address is used by WILLIAMS and his drug trafficking organization. Described as a multi-unit apartment building, the **TARGET LOCATION** is located in the lower level, northeast corner unit. The building has a tan brick exterior and a red in color front door with two red in color doors on the rear. The numbers 5670 are affixed to the building directly above the center of the front door. When looking at the rear of the residence the **TARGET LOCATION** is the lower level right side red door.





34

## ATTACHMENT B

### ITEMS TO BE SEIZED

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, between February 2023 to present including:

a. Evidence of the crimes described above;

b. Preparatory steps taken in furtherance of those crimes;

c. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

d. Evidence of motive, intent, or knowledge of the crime described above;

e. Evidence of the location, whereabouts, and patterns of travel of Duane WILLIAMS;

f. Evidence about the appearance, clothing, and identity of Duane WILLIAMS;

g. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances and counting drug proceeds;

h. Containers to hold or transport controlled substances and drug trafficking related items and proceeds;

i. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

j. Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

k. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

l. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

35

m. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

n. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

o. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxicab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

p. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

q. Photographs, videotapes or other depictions of assets, coconspirators, controlled substances, or other paraphernalia associated with drug trafficking;

r. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

s. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

t. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachments A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of any individuals found at the **TARGET LOCATION** to the fingerprint sensor ("Touch ID") and (2) to present the face of any individuals found at the **TARGET LOCATION** to the facial recognition sensor, such

as a camera, ("Face ID") of the device found at the **TARGET LOCATION** for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.